UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DONALD ROBINETTE,

       Plaintiff,

v.                            Civil Action No. 2:19-cv-00688

ZURICH AMERICAN INSURANCE
COMPANY,

       Defendant.

MEMORANDUM OPINION AND ORDER

       Pending is defendant Zurich American Insurance
Company's ("Zurich") renewed motion for summary judgment that
addresses only the plaintiff's bad faith claim, filed January
19, 2021.  ECF No. 111.

I.  Background

       Plaintiff Donald Robinette, a resident of
Staffordsville, Kentucky, was involved in a traffic accident
with Tamalyn Cabell on MacCorkle Avenue in Chelyan, West
Virginia on October 2, 2017.  ECF No. 1-1 (Complaint); ECF No.
67-1, at 9-20 (State of West Virginia Uniform Traffic Crash
Report).  The crash report describes the accident as follows:

> Vehicle Number One [Cabell] was attempting to pull out
> onto MacCorkle Avenue from the Dollar General store
> parking lot after dropping off her grand daughter.  As
> Vehicle One was pulling onto MacCorkle Avenue, the
> driver of Vehicle One pull[ed] out in front of
> Vehiicle [sic] Number Two [Robinette].  Vehicle Number
> Two was unable to stop in time because Vehicle Number
> One came out between two other vehicles.  Vehicle
> Number Two struck Vehicle Number One in the passenger
> side front door area.

ECF No. 67-1, at 10.  David Bangham was a passenger in the truck

driven by Robinette.[1]  See ECF No. 74-1, at 40-41 (Motion to

Intervene in Bangham v. Cabell).

        During his deposition, Robinette stated that he began

to work for Eagle Creek Mining LLC ("Eagle Creek"), "right

around the second week of December '10."  ECF No. 67-1, at 21,

27:16-17 (Robinette Deposition Transcript).  Robinette reported

that approximately six months later, he transferred to "their

other company," Hawkeye Contracting LLC ("Hawkeye").  Id. at

21-22, 27:23-28:1.  Robinette was working for Hawkeye at the

---

[1]    This information is obtained from Robinette's motion to
intervene in Bangham's separate lawsuit, discussed further
herein.  The court notes, however, that the passenger data page
of the crash report, produced by Zurich, ECF No. 67-1, at 20, is
redacted such that Bangham is not identifiable as a passenger in
that document.

time of the accident.  ECF No. 72-1, at 2, 110:20-21 (Robinette

Deposition Transcript Produced by Robinette).

When the accident occurred, Robinette was driving a

2007 Chevrolet pickup truck owned by Falcon Ridge Leasing LLC

and registered in Kentucky.  ECF No. 67-1, at 16.  When

questioned about the pickup truck during his deposition,

Robinette responded that the back windshield bore a set of

four-digit numbers identifying the vehicle with Hawkeye.  ECF

No. 72-1, at 3, 129:5-16.  The following exchange ensued:

> Q.  And if the police report indicates that the
> vehicle was owned by Falcon Ridge Leasing —
>
> A.  Same company.
>
> Q.  As Hawkeye?
>
> A.  The same people own it.
>
> Q.  Okay.  So we've got three companies that are
> basically the same, then?
>
> A.  Yes, sir.
>
> Q.  Hawkeye, Eagle, and Falcon?
>
> A.  Hawkeye Contracting, Eagle Ridge — Eagle Creek
> Mining, Falcon Ridge Leasing.
>
> Q.  Are there any other bird-named companies?
>
> A.  There are quite a few.
>
> Q.  Quite a few?
>
> A.  Condor Mining.  Just — they're bird crazy.

Q.  Who — who are the people behind these bird companies?

A.  The — the Potter family that owns them.

Q.  The Potter family?

A.  Yes.

Q.  Is there a head of the Potter family?

A.  No, I — as far as structure, I don't know anything about it.

Id. at 3, 129:17-130:16.

The plaintiff has produced an October 2, 2017 "Preliminary Incident Investigation Report" conducted by "Eagle Creek Mining LLC — Hawkeye LLC."  ECF No. 72-1, at 27-29 (Preliminary Incident Investigation Report from Claim File). This report, composed by supervisor Derrick Lambert, indicates that Robinette, a "mechanic," was travelling toward Cabin Creek, West Virginia on his way to work in a "company truck (Silverado 1500)" when the accident occurred.  Id. at 27.   The report stated that he suffered injuries to his vertebrae, right knee, right hip, and head and that he was treated at Thomas Memorial Hospital.  Id. at 28-29.

The truck was insured by Zurich Policy Number BAP 9310798-06, effective July 1, 2017.  ECF No. 67-1, at 8 (Zurich Policy's Schedule of Named Insured(s)).  The named insureds

listed in the policy are: Eagle Creek, Falcon Ridge, Kapo Mining LLC, and JMP Coal Holdings.[2] Id.

In a letter to Maximilien Markel of Zurich's Claims Department dated November 1, 2017, Joshua R. Martin, counsel for Robinette, informed that he had been retained to represent the plaintiff and that Robinette was "assert[ing] all possible claims under your insured's policy . . . ." ECF No. 67-1, at 24-25 (November 1, 2017 Letter). Martin requested that Zurich provide "all applicable insurance policies, including declarations, that apply to this claim within the next thirty days." Id. at 24. He specified: "This includes each of the known policies of insurance, including medical payments coverage, excess or umbrella insurance, which may, or does, provide underinsured coverage for the claim." Id. Markel responded by letter dated November 28, 2017, stating, inter alia, "There is no UM/UIM or Med Pay coverage on this policy." ECF No. 67-1, at 26 (November 28, 2017 Letter).

---

[2]     The Schedule of Named Insured(s) produced by Zurich is the only portion of the policy at issue submitted by either Zurich or Robinette.

A May 3, 2018 release of claims indicates that
Robinette settled with Cabell's liability insurer for $100,000.[3]
ECF No. 74-1, at 10 (May 3, 2018 Release of Claims).  Robinette
and Zurich acknowledge that the $100,000 settlement was for the
policy limits of Cabell's liability insurance.  ECF No. 72, at 2
(Response to Motion for Summary Judgment); ECF No. 74, at 6
(Reply in Support of Motion for Summary Judgment).

A May 4, 2018 claim note by Markel describing a
conversation with Martin states that the attorney informed him
that Robinette had been undergoing "conservative treatment" for
"sustained herniation in lumbar."  ECF No. 68-1, at 27 (May 4,
2018 Claim Note).  Martin reported that Robinette planned to
continue pain management treatment but that no surgeries had
been conducted or recommended to date.  Id.  In total,
Robinette's medical bills associated with the injuries sustained
in the accident had amounted to $22,000.  Id.  Martin also
advised Markel that Robinette, "has about a 50,000 lost wage
claim – he makes around 100k a year" and that Robinette had
"just exhausted at fault carriers limits of 100k," this point
presumably referencing Cabell's liability insurer.  Id.
Finally, Markel noted, "we discussed UM coverage and I corrected

---

[3]     Cabell's liability insurer is not named on the release of
claims or by the parties in their briefs.

myself from last letter that was sent and confirm correct UM coverage of 1,000,000 . . . .[4] [Martin] was fine with this and I advised I would send an amended acknowledgment letter to him."[5] Id.

Robinette has produced testimony from Zurich's Federal Rule of Civil Procedure 30(b)(6) representative Derek Hurlbert regarding the timing of a coverage determination. ECF No. 72-1, at 5-9 (Hurlbert Deposition Transcript). When asked to explain the step-by-step process by which a coverage determination is made, Hurlbert responded as follows:

> So typically the policy is attached to the electronic file. The claim professional would have access to that. And in gaining access to it they would obviously check who the insured is. Entities that are insured, additional insureds, et cetera, make sure that the loss or the policy actually applies to the date of the loss that is being submitted for cover. Check the limits of insurance and determine what is available and what would not be available with respect to the claimant[] being covered.

Id. at 6, 13:11-20. Hurlbert affirmed that it would be unusual "for coverage not to be determined within six months." Id., at 6, 14:11-13. This line of questioning continued:

---

[4]    Although "UM" is often used to refer to uninsured motorist coverage, it is apparent from the facts of this case, which involves underinsured motorist coverage, that Markel intended to convey that underinsured motorist coverage in the amount of $1,000,000 was available under Zurich's policy.

[5]    Such a letter does not appear in the record.

Q.  Would it be outside of Zurich's standards and
procedures for a clear determination of coverage not
to be made within six months?

A.  Depending on the circumstance, I would expect the
coverage determination to be made prior to six months.
If there are extenuating circumstances that push that
beyond that period of time then there should be
explanations as to why.

Q.  And those explanations, would they be in the
claims file?

A.  They should be contained in the claims file, yes.

Id. at 6, 14:14-25.

When asked about a portion of Zurich's "2017 best
practices" (presumably a handbook) that states "[a]n effective
coverage analysis and determination will be made as soon as
practical but no more than 30 days from our receipt of all
necessary coverage related information," Hurlbert responded that
"[u]nder normal circumstances and a normal loss," such necessary
information "should be contained with the first notice of loss."
Id. at 6, 15:1-20.  The questioning continued:

Q.  And would it be fair to say, sir, that any
investigation or any action taken by the case manager
should be noted in the claims file?

A.  With respect to investigation of the claim that's
being presented, yes, I would say — I would say I'm
not comfortable with the question.

Q.  Okay.

A.  Any action taken by a claims professional should
not be documented in the claim file if it doesn't
relate to that claim file.

Q.  . . . I apologize.  You correctly assumed what I
was asking or I was trying to get at is any time a
case manager is trying to investigate a claim or any
action taking an investigation of the claim, should
that be noted in the claims file?

A.  It should.

Q.  Okay, and if it's not noted in the case file,
would that be a deviation from the best practices
established by Zurich?

A.  Yes.

Q.  Okay.  I want to go back just a little bit here to
the initial investigation of whether or not there's
coverage.  And with regards to new claims, what is
Zurich's position about how quickly a coverage
determination should be made?

A.  With respect to new claims, a coverage
determination – the determination should be made
within 30 days.

Q.  Okay. And why is it important to Zurich for a
[coverage] determination to be made within 30 days?

. . .

A.  It's important for us because that – that starts
the process.  So like I said before, the first step is
coverage.  So when a claim is made a prompt coverage
determination should be made by the claim professional
so that the claim can proceed.

Id. at 7, 25:3-26:15.

     Martin submitted a demand letter to Zurich on May 14,

2018.  ECF No. 74-1, at 11-17 (May 14, 2018 Demand Letter).  The

demand letter calculated the medical expenses to date as

amounting to $21,366.04.  Id. at 14.  With regard to lost wages,

it stated that he missed 32 weeks of work, in which he would
have been paid $51,264, and estimated future lost wages at
$1,190,000 inasmuch as it was unlikely that he could go back to
being a heavy machine mechanic and would likely lose a
significant portion of his income by taking a lower-paying job.
Id. at 14-15.  The letter estimated that future medical expenses
would fall in the range of $54,000-$87,000.  Id. at 15.
Additionally, the letter estimated other damages as follows:
$1,000,000 for loss of enjoyment of life and pain and suffering;
$500,000 for Robinette's loss of consortium; and $500,000 for
Robinette's wife's loss of consortium.  Id. at 16.  These
expenses, damages, and costs were estimated to amount to
$3,316,630.04-$3,349,630.04.  Id.  The letter demanded
$275,707.04, or if that figure exceeded the underinsured
motorist policy's limits, the policy limits, which was
effectively a $275,707.04 demand inasmuch as the coverage
provided for $1,000,000.  Id. at 11.

On June 19, 2018, Zurich Claims Specialist Katie
Niergarth sent Martin an email stating that Robinette's claim
had recently been transferred to her and requesting an extension
of 30 days to review the file and respond to the demand letter.
ECF No. 74-1, at 18 (June 19, 2018 Email Chain).  Martin
responded later that day: "That's fine.  Please let me know if

you need additional documents." Id.  On July 3, 2018, Erin
Copp, a Travelers Claim Professional serving as an adjuster on a
separate workers' compensation claim asserted by Robinette, sent
Niergarth an email informing her that, "[w]ages paid to date are
$14,522.23 and medicals $3[,]099.53."  ECF No. 74-1, at 19 (July
3, 2018 Email).  Niergarth subsequently sent an email to Brandy
Helton, whose email address indicates that she worked for
"jmpholdingsllc," asking whether Hawkeye "had a separate Auto
Liability policy" inasmuch as it was not a named insured on the
Zurich policy.  ECF No. 74-1 (July 23, 2018 Email Chain).
Helton responded the same day, "Yes, Hawkeye is insured through
the Travelers Indemnity Company."[6]  Id.

       The record does not reveal any further investigation
or communication with Martin prior to November 15, 2018.  A
November 15, 2018 claim note authored by Niergarth describes a
conversation between her and Martin regarding the demand letter.
ECF No. 74-1, at 21 (November 15, 2018 Claim Note).  The claim
note states as follows:

---

[6]    It is not entirely clear from the record what role Helton
occupied at JMP.  Zurich asserts that she is "a representative
of Eagle Creek Mining, LLC and Hawkeye Contracting, LLC," two
businesses that appear to be affiliated with JMP, ECF No. 74, at
11, but the email chain does not describe her role or
affiliation with any of these companies.

> Received call from Joshua Martin, attorney for Don
> Robinette. He wants to discuss the demand.  Advised I
> have reviewed it and don't believe his clients
> injuries and treatment warrant any exposure under the
> UIM policy.  Advised the settlement they have already
> received appears to be sufficient.  He states his
> client is still treating with nerve block injections
> at a pain center.  He states he will never be able to
> do the same job again and can't make the same amount
> of money as he did before.  He advised his client was
> making $75k-$90K a year as a heavy equipment mechanic
> required to lift up to 150 pounds frequently.  Advised
> that doesn't add up with what WC [workers'
> compensation] has paid for wages for 9 months.
>
> Joshua stated there are pain center records and IME
> reports that he can send to me.  I asked if his client
> has been recommended for any surgeries.  He said no,
> but they have not yet addressed the congenital wedging
> in the spine. Asked if he could send the MRI films for
> us to review with an independent radiologist.  He said
> he doesn't have them.  Asked if he could provide
> authorization for us to obtain them. He said he does
> not give authorization to insurance carriers.  Asked
> if he would provide them to us so we can review what
> may be pre-existing and what is acute.  He will see
> what he can do.
>
> Advised I will review the documents he has as well as
> the MRI films and see if that will change my position.

Id.  The same day, Niergarth sent Martin an email asking for the

pain center records, IME reports, and MRI films that had not

previously been disclosed.  ECF No. 74-1, at 22 (November 15,

2018 Email).  She also indicated that "[w]e would like to have

an independent radiologist review the films to provide another

opinion regarding the acute injuries and pre-existing issues."

Id.  In the event that Martin would not authorize Zurich to

obtain the MRI films itself, Niergarth asked that he "request

the films from the provider(s)" and send them to her.  Id.
Zurich contends that Martin never provided the MRI films.  ECF
No. 74, at 15.

On March 1, 2019, Michael Norton of Zurich sent Martin
a letter informing that he had "assumed responsibility for the
handling of [Robinette's] claim file . . . as a part of
[Zurich's] effort to ensure all claims are managed by the Zurich
U.S. Claims professional best equipped to handle the needs of
the claim at all times."  ECF No. 74-1, at 23 (March 1, 2019
Letter).  An email from Martin to Norton on May 6, 2019
documents a conversation between the two regarding expenses and
a settlement demand and states:

> It was good to talk to you today.  Attached is a
> summary of all billing in this matter to date.  I
> calculated $50,329.65 in billing to date.  Please be
> advised that Mr. Robinette is scheduled for another
> RFA [radiofrequency ablation] this month and
> injections next month, which should add another $10K
> to $15K in billing to his claim.  At this time Mr.
> Robinette has lost out on more than $128,000 in lost
> wages and benefits.  Therefore, we are renewing our
> demand for policy limits in this matter.  My client
> has not had any serious pain relief from his
> treatments, and it is unlikely that he'll ever go back
> to being a mechanic in a coal mine again.  Given his
> young age[,] his lost wage claim will easily be in the
> seven figures.

ECF No. 74-1, at 24 (May 6, 2019 Email).

Martin sent Norton a facsimile of a new demand letter on July 10, 2019.  ECF No. 74-1, at 33-34 (July 10, 2019 Demand Letter).  In this demand letter, Martin indicated that he had submitted past medical bills totaling "near $50,000.00" and that the lost wages have "easily eclipsed $130,000.00."  Id. at 34.  The damages claimed in the demand letter were: $1,585,477.90 in future medical expenses; $5,000,000.00 in loss of enjoyment of life and pain and suffering; $2,054,940-$2,457,671 in lost wages; $1,000,000 in loss of consortium for Robinette; and $1,000,000 in loss of consortium for Robinette's wife.  Id. Martin made a settlement demand for $11,043,148.90 or, if this figure exceeded the policy limits, the policy limits.  Id. at 33.

Attached to the July 10, 2019 facsimile was a May 23, 2019 life care plan for Robinette prepared by Dr. Richard Bowman of RGB Medical, Inc., documenting projected expenses from 2019 (Robinette being 39 years of age) to 2057 (Robinette being 77 years of age) for physical therapy ($168 for an initial visit, $117 for follow-up visits with seventeen visits expected in year one), recreational therapy ($45 per visit with eight visits expected in year one), MRIs for his lumbar ($2,886 per MRI conducted once every two years) and cervical spines ($2,886 per MRI conducted once every two years), podiatry toenail trimming

($59 per occurrence, twice per month as needed with lumbar disc
herniation), left cervical medial branch block injections
($6,250-$8,780, depending on the hospital, once in year one),
lumbar facet medial branch radiofrequency ablations ("RFAs")
($9,032.35 once per year for both right and left RFAs); lumbar
epidural steroid injections ($6,625-$7,150, depending on the
hospital, three times every twelve months); left cervical facet
joint medial branch RFAs ($9,032.35 once per year); Cabell
Huntington Pain Clinic office visits ($140 three times per
year); heavy cleaning services for home maintenance ($108 twice
per month); and yard services ($35-$45 26 times per year).  ECF
No. 74-1, at 25-32 (Facsimile of Life Care Plan).

       Also attached to the July 10, 2019 demand letter
facsimile was a vocational evaluation and economic analysis of
the present value of lost earnings and future medical and care
costs composed by George A. Barrett, a Certified Rehabilitation
Counselor, Certified Vocational Evaluation Specialist, and
Forensic Economist of Brookshire, Barrett & Associates, LLC.
ECF No. 72-1, at 37-61 (Barrett Report).  Under "Method 1,"
Barrett found the difference between the present value of
pre-injury future earnings $2,457,671 (based on $83,847 per year
earnings in 2017 dollars, an average of Robinette's wages earned
from 2015-2017, annualized for the year 2017) and residual

post-injury future earnings of $402,731 (based on a $17,313 per year income as a counter and rental clerk or parts salesman) to be $2,054,940.  Id. at 46-47.  Under "Method 2," which did not account for residual post-injury future earnings, the difference was calculated to be $2,457,671.  Id. at 47.  Barrett calculated the present value of future medical and care costs to be $2,283,128 based on Bowman's life care plan adjusted for medical price cost inflation.[7]  Id. at 48.

On July 12, 2019, Zurich Major Case Unit Claims Specialist Nick Sanders sent an email to Martin informing that the claim had been transferred to him and that he was reviewing the July 10, 2019 settlement demand.  ECF No. 74-1, at 35 (July 12, 2019 Email).  On July 29, 2019, Sanders reached out to Martin and requested that he and Robinette attend an August 26, 2019 mediation scheduled for Bangham's separate lawsuit, Bangham v. Cabell, Case Number 18-C-640 in the Circuit Court of Kanawha County, against Zurich concerning the same underinsured motorist policy, to which Martin agreed.  ECF No. 74-1, at 36-37 (July 29, 2019 Email Chain).

---

[7]    It is worth noting that the $2,283,128 future medical and care costs calculation is significantly higher than the $1,585,477.90 "future medical expenses" damages claimed by Martin in the July 10, 2019 demand letter sent to Norton.  Both figures, however, would exceed the underinsured motorist coverage $1,000,000 policy limits irrespective of lost wages.

An August 27, 2019 letter from Sanders to Martin documents the results of these negotiations, stating, in relevant part:

> As a recap, I offered your client $150,000.00 in settlement of his claims.  You left . . . after making a demand of $500,000.00 and refusing to negotiate further.
>
> I would remind you that Zurich has $1,000,000.00 combined/single UIM limits available in this case.  As we have previously discussed, your client is alleging his damages exceeding the policy limits and there is a trial set for October of 2019 on Mr. Bangham's claim. We invited you to the mediation to give your client an opportunity to negotiate his claim and avoid any potential value of your client's claim from being depleted by a potential verdict in the Bangham case.
>
> Although we were unable to come to an agreement at mediation, I am willing to make an offer of $175,000.00; this offer will remain open for 7 days from the date of this letter . . . .  The offer is generally based on the medical records provided by your office, which shows your client suffered from either minor soft tissue injuries or degenerative, pre-existing conditions unrelated to the October 2, 2017 motor vehicle accident.  We also appreciate that any litigation/trial carries potential risk for both parties.  In addition, my offer contemplates the $100,000.00 credit I would get at a trial for the tortfeasor's liability limits and the $10,000.00 credit for PIP payments previously paid to your client.  I would also note that I have not had a chance to obtain Mr. Robinette's prior medical records or have him examined by a medical professional of my choosing.

ECF No. 74-1, at 38-39 (August 27, 2019 Letter).  Zurich contends that Martin did not respond to the $175,000 offer.  ECF No. 74, at 14.

Robinette, through Martin, filed a motion to intervene in Bangham's separate lawsuit on August 26, 2019, i.e., the same day as the mediation.  ECF No. 74-1, at 40-41.  The motion to intervene stated, in relevant part:

> Plaintiff Robinette claims an interest relating to the property which is the subject of this action, namely Zurich['s] . . . underinsured motorist policy, insurance policy number BAP 9310798-06, which is an eroding policy.  Therefore, not allowing to intervene in this matter may prevent him from recovering for injuries he sustained.

Id. at 40.

The record does not convey the disposition of the motion to intervene in the Bangham's case.  However, Robinette filed this action in the Circuit Court of Kanawha County two days later on August 28, 2019.  ECF No. 1-1 (Complaint).  The complaint contains a single count, entitled "Negligence and Underinsured Motorist Coverage," against Zurich and defendant State Farm Mutual Automobile Insurance Company.[8]  Id. at ¶¶ 20-26.  He alleges that:

---

[8]   State Farm, Robinette's personal insurer, settled with the plaintiff and all claims asserted against it were dismissed with prejudice by order dated February 10, 2021.  ECF No. 115. Zurich is the only remaining defendant in this action.

> Ms. Cabell's negligence and breach of [her duty of
> care] proximately caused injuries to the Plaintiff
> including but not limited to serious and permanent
> bodily injury and tremendous physical and mental pain
> and suffering, medical expenses, lost wages (past and
> future), loss of ability to perform household
> services, loss of the ability to enjoy life,
> humiliation, embarrassment, annoyance, anxiety,
> aggravation, mental anguish, inconvenience, emotional
> distress, loss in the ability to perform daily
> activities, as well as other injuries and economic and
> noneconomic damages, all of which Plaintiff will
> continue to suffer into the foreseeable future, and
> which far exceed Ms. Cabell's insurance.

Id. at ¶ 23.  The "Plaintiff asserts that defendants have failed to comply with their contractual obligations to pay for damages in excess of Ms. Cabell's liability insurance."  Id. at ¶ 24. Robinette further alleges that the failure to pay constitutes bad faith and that he "has provided sufficient medical and economic documentation showing damages well in excess of Ms. Cabell's liability insurance."  Id. at ¶ 25.  Zurich views this count as asserting two claims – one for personal injury, which pertains to its obligation to pay Robinette insurance proceeds under the underinsured motorist coverage, and a separate claim for bad faith, which concerns its handling of the underinsured motorist claim.  See ECF No. 90, at 2 (Zurich's Motion to Defend in the Name of the Tortfeasor, Preclude Reference to Insurance, and Bifurcate Trial) ("The Court should bifurcate Plaintiff's personal injury claim from Plaintiff's 'bad faith' claim.")

With respect to the bad faith claim, Zurich has produced the report of Robinette's expert witness Burke A. Christensen, JD, CLU, which is based on the expert's review of the complaint, insurance policy, and claim file.  ECF No. 67-1, at 28-31 (Christensen Expert Report).  Christensen is an attorney with experience in the insurance industry as well as a professor of insurance at Eastern Kentucky University who has taught insurance seminars and written and edited books and articles concerning insurance.  Id. at 28.  In the background section of his report, Christensen stated that Robinette "was driving a car owned by his employer Eagle Creek Mining Company, LLC" when the accident occurred and that the car was insured under Zurich's policy.  Id.

Christensen opined that "it is not consistent with the standards of practice in the industry for an insurer to affirmatively deny coverage which the policy clearly provides." Id. at 30.  He also stated that "[t]he misreading of a policy to the detriment of the insured may also be characterized as arbitrary and capricious."  Id.  With respect to this case, he observed, "I have seen nothing in the [Zurich's claims] file [pertaining to Robinette's underinsured motorist coverage claim] which is an 'adequate, reasonable justification' for an insurer

to wrongfully report the terms of the coverage provided in its

own policy." Id.  Christensen concluded:

> It is my opinion that the standards of the insurance
> industry will support a finding of bad faith if there
> is evidence of knowing or arbitrarily unreasonable
> actions.  This standard can be rephrased as a
> three-part test:
>
> 1.  The insurer is/was obligated to pay the claim
> under the terms of the policy.  (The Zurich policy was
> obligated to provide this coverage.)
>
> 2.  The insurer lacks/lacked reasonable basis in law
> or fact for denying the claim[,] (Zurich had no
> reasonable basis for denying the coverage)[,] and
>
> 3.  The insurer:
>
>> a.  Knew or should have known there was no
>> reasonable basis for denying the claim (Zurich
>> should have known this), or
>>
>> b.  Acted with reckless disregard for whether
>> such a basis existed (Zurich's action in denying
>> the existence of coverage which any reading of
>> the policy would have disclosed is consistent
>> with a reckless disregard of the actual terms of
>> the policy.[)]

Id. at 31.

     During Christensen's deposition, counsel for Zurich

also probed Christensen's knowledge of Robinette's employment at

the time of the October 2, 2017 accident:

> Q.  Mr. Christensen, were you aware that Mr. Robinette
> testified under oath in this case that at the time of
> the accident he was actually working for a company
> called Hawkeye Contracting?

A.  I've not read a deposition from Robinette, so I
don't know what that says.

Q.  Are you aware that Eagle Creek Mining, Hawkeye
Contracting, and Falcon Ridge Leasing are all separate
LLCs that are formed under Kentucky law?

A.  Am I aware they're separate organizations?

Q.  Yes.

. . .

A.  Well, I would assume that any company that has an
LLC after it is a different company from another LLC.
Yes.  I'll accept that.

Q.  So if Mr. Robinette testified in his deposition
that he was working for Hawkeye Contracting, your
statement that he was - his employer was Eagle Creek
Mining would be incorrect; would it not?

A.  If he wasn't working for Eagle Creek Mining, then
my statement is incorrect.

Q. Were you — before I ask you questions about Hawkeye
Contracting, were you even aware that that entity
existed?

A.  No, ma'am.

Q.  And if there are references to Hawkeye Contracting
in the claims file, did you not see those references?

A. If they were in the claims file, I would've seen
them.  My response to your line of questioning here is
that what seemed to be important in the case didn't
seem to be a dispute over who was his employer and who
owned the car. There was nothing in the file until
very late, maybe around page 900 or so, as to whether
or not the truck was listed on the covered vehicles.

ECF No. 67-1, at 34-35, 185:4-186:17 (Christensen Deposition

Excerpts Provided by Zurich).  When asked whether the existence

of three entities, i.e., Eagle Creek, "the insured," Falcon

Ridge, "the owner of the vehicle,"[9] and Hawkeye, "Robinette's employer," "could create an issue in trying to determine whether there is in fact insurance coverage," Christensen responded: "It might well be, but that's certainly not reflected in the claims file.  I don't see anywhere in the file that the insurance company is saying, hey, go away; you're not one of our insureds."  ECF No. 72-1, at 16, 189:12-190:1 (Christensen Deposition Excerpts Provided by Robinette).

With respect to the expert report paragraph in which he opined that the claim file did not present an adequate and reasonable justification for an incorrect determination on underinsured motorist coverage, Christensen testified, "In my mind, I thought that the claim file was incomplete in its entirety . . . ."  Id. at 17, 198:21-22.  When asked further by Martin about his impression of the claim file, Christensen stated:

> It was hard to follow.  What I would describe as the actual claims file, as a part of the 1600 plus pages that are identified as the claims file, is the document — and I don't remember the name assigned to it now, but it seemed to be a document that grew over time as more information was acquired by Zurich.  I couldn't tell when that document was updated, and some of that information seemed incorrect with respect to identification of parties and so forth, so —

---

[9]    As observed above, Falcon Ridge is also a named insured on the policy.

> And it did not reflect any actions which I normally
> see in a claim file that say things like — or have in
> it examples like, sent a request to a client or a
> claimant for X document or your claim is suspended
> based upon the need for this information.
>
> The only thing of that sort that I recall now is, very
> early on in the file, there were a couple of letters —
> or a couple of entries indicating letters had been
> sent to Robinette, because he apparently was not
> responding as quickly as they wanted him to, but then
> all that sort of stuff dropped off.
>
> And so I think I . . . it just doesn't seem to have in
> it the — a chronological record of actions taken by
> the adjuster to find the information needed to satisfy
> the claim.

Id. at 18, 207:16–208:16.  Christensen further stated that his

report did not discuss damages or whether Zurich's investigation

into Robinette's damages violated any industry standard.  ECF

No. 67-1, at 36, 212:6-23.

Zurich has produced its own June 22, 2020 expert

report from J. Rudy Martin, a mediator, arbitrator, insurance

consultant, and lawyer, who opined about the propriety of

Zurich's handling of Robinette's claim as it relates to

Christensen's report on bad faith.  ECF No. 67-1, at 37-40

(Martin Expert Report).  Martin stated that "the critical

inquiry when an error has occurred [in addressing an insurance

claim] is what does the claim handler do once the error or

oversight is discovered . . . . Bad faith requires an improper

intent and a corrected mistake does not rise to that level.

Such is the case here." Id. at 2. Martin also opined that the question of coverage in this case "was not so clear" inasmuch as Robinette worked for Hawkeye, which was not an insured, "Zurich's initial investigation indicated that there was no contract in place for Hawkeye to provide services for Eagle Creek," "Zurich had previously declined to insure Hawkeye," and "the vehicle . . . was owned and operated by yet another company — Falcon Ridge Leasing." Id. at 38-39. In Martin's opinion, Zurich "corrected its opinion and appropriately extended coverage" after further investigation revealed that coverage would apply, which is conduct "consistent with the custom and practice in the insurance industry." Id. at 39.

J. Rudy Martin further stated that Zurich did not deny Robinette's claim after coverage was determined but appropriately took efforts to investigate certain issues relating to his injuries, including diagnoses of degenerative disc disease, facet hypertrophy, and sacroiliac degenerative joint disease, as well as an emergency room examination that did not show neck or back dislocation or fracture or traumatic head abnormalities. Id. at 39. He also observed that Robinette asserted that he had a herniated L5-S1 disc in connection with his workers' compensation claim, which was inconsistent with a prior diagnosis, presumably following the accident, of a

cervical muscle strain and an authorization to return to work.
For these reasons, "the nature and extend [sic] of injures
[sic], if any, Robinette may have sustained in the accident were
unclear." Id. Martin concluded that Zurich's conduct,
including its requests for a yet-to-be-completed independent
medical examination and vocational rehabilitation assessment,
have been "consistent with the custom and practice in the
insurance industry." Id. at 40.

The plaintiff has produced a March 19, 2020 email from
counsel for Zurich to Dr. Prasadaro Mukkamala, M.D. confirming
his "retention to perform a records review and IME of Plaintiff
on Behalf of Zurich American Insurance and State Farm Mutual
Insurance." ECF No. 72-1, at 62 (March 19, 2020 Email).
Robinette asserts that the retention of Mukkamala while
discovery was ongoing in this action was the first independent
step taken by Zurich to evaluate his damages. ECF No. 72, at
11.

On June 19, 2020, Zurich filed a motion for a
protective order relating to Robinette's proposed topics for
Hurlbert's Rule 30(b)(6) deposition. ECF No. 47 (Motion for
Rule 30(b)(6) Deposition Protective Order). One such topic,
Topic I.5, concerned the ability to elicit testimony relating to
violations of Kentucky and West Virginia bad faith statutes.

Id. at 6.  In an order entered July 7, 2020, United States

Magistrate Judge Dwane. L. Tinsley held as follows:

> This topic requests information about how Zurich
> complies with Kentucky and West Virginia statutes
> governing insurance claims handling. (ECF No. 44-1.)
> As an initial matter, Zurich correctly asserts that it
> is not at all clear from the complaint whether
> Plaintiff seeks to make a claim under either of these
> statutes. The complaint's only claim is "COUNT I
> (Negligence and Underinsured Motorist Coverage)," and
> while it mentions "bad faith," there is no indication
> that Plaintiff makes a statutory claim under either
> Kentucky or West Virginia law. (ECF No. 1-1 at 6-7.)
> This topic is therefore beyond the scope of
> permissible discovery.  Fed. R. Civ. P. 26(b)(1).
> Moreover, to the extent Plaintiff's proposed line of
> questioning seeks to have Zurich's corporate
> representative to make a legal conclusion as to
> whether Zurich's conduct complied with the statutes
> Plaintiff identifies, that is not a proper subject for
> a Federal Rule of Civil Procedure 30(b)(6) deposition.
> Caraustar Indus., Inc. v. N. Ga. Converting, Inc., No.
> 3:04-cv-187- H, 2005 WL 8174172, at *3 (W.D.N.C. Sept.
> 9, 2005).  Accordingly, Zurich's motion for protective
> order is GRANTED as to Topic I.5.

ECF No. 56, at 4 (Order Addressing the Motion for a Protective

Order).

         Zurich filed a motion for summary judgment on August

10, 2020.  ECF No. 67 (Motion for Summary Judgment).  On August

24, 2020, Robinette filed a motion to reopen discovery since

Zurich failed to disclose certain claim notes from the claim

file.  ECF No. 73 (Motion to Reopen Discovery).

Inasmuch as it was clear that Zurich had failed to disclose a portion of the claim file, the court denied the motion for summary judgment and reopened discovery on October 22, 2020.  ECF No. 101 (October 22, 2020 Memorandum Opinion and Order).  In doing so, the court authorized Christensen to amend his report to account for previously undisclosed discovery materials.  Id. at 8-9.

Zurich thereafter filed its renewed motion for summary judgment on January 19, 2021.  ECF No. 111.  The defendant incorporated by reference its arguments set forth in its briefs pertaining to its original motion for summary judgment, claiming that they are now ripe for consideration inasmuch as Robinette failed to conduct further discovery or amend Christensen's expert report.  ECF No. 112, at 2-3 (Memorandum in Support of Renewed Motion for Summary Judgment).  Robinette did not respond to the renewed motion for summary judgment.

## II.  Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News

& Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d
570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact
exists if, in viewing the record and all reasonable inferences
drawn therefrom in a light most favorable to the non-moving
party, a reasonable fact-finder could return a verdict for the
non-moving party.  Anderson, 477 U.S. at 248.  Although the
court views the evidence in the light most favorable to the
nonmoving party, "that party must produce evidence that goes
beyond '[c]onclusory or speculative allegations' and [must]
rel[y] on more than 'a mere scintilla of evidence' to withstand
summary judgment."  Hodgin v. UTC Fire & Sec. Americas Corp.,
Inc., 885 F.3d 243, 252 (4th Cir. 2018) (first alteration in
original) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d
645, 649 (4th Cir. 2002)).

        Although Robinette did not respond to the renewed
motion for summary judgment, the court is obligated to analyze
the motion and determine whether Zurich is entitled to judgment
as a matter of law.  See Maryland v. Universal Elections, Inc.,
729 F.3d 370, 380 (4th Cir. 2013) (citing Robinson v. Wix
Filtration Corp., 599 F.3d 403, 409 n. 8 (4th Cir. 2010)).
Inasmuch as the renewed motion merely incorporates by reference
the arguments in favor of its original motion for summary

judgment, the court will consider all arguments and evidence
offered by the parties in connection with the original motion.

### III.  Analysis

Zurich asserts that its actions prior to May 4, 2018
do not constitute intentional, outrageous, or recklessly
indifferent conduct such that Robinette may sustain a bad faith
claim.  ECF No. 68, at 10-11.  Zurich contends that confusion
over Robinette's employer Hawkeye, which was not a named insured
on the policy at the time of the accident, caused the mistaken
denial of coverage documented in the November 28, 2017 letter
from Markel to Martin.  Id. at 11.  Zurich points out that
Robinette did not have to hire counsel or file suit to correct
the mistake inasmuch as Martin was retained prior to the
November 28, 2017 letter and Zurich corrected its mistake on May
4, 2018 — long before the complaint was filed on August 28,
2019.  Id. at 11-12.  Zurich also contends that "regardless of
whether coverage was initially denied or not," no bad faith
occurred inasmuch as it was not required to pay the underinsured
motorist claim until after the policy limits of Cabell's
liability coverage were exhausted, which did not occur until May
3, 2018 when Martin reported settlement with Cabell, i.e., the
day before it revised its coverage decision.  ECF No. 74, at 5-6
(citing State Farm Mut. Auto. Ins. Co. v. Riggs, 484 S.W.3d 724,

729 (Ky. 2016)).  Zurich also emphasizes that it unilaterally took action to correct its mistake and was not prodded by plaintiff's counsel to do so, which it characterizes as good faith conduct.  Id. at 8.  Zurich contends that insofar as Robinette highlights its failure to comply with its best practices handbook, he does not cite any authority indicating that this constitutes bad faith as intentional misconduct or reckless disregard.  Id. at 17-18.

Zurich further argues that to the extent Robinette asserts the handling of the claim after its acknowledgement of coverage constitutes bad faith, the evidence does not support this position.  Id. at 10-17.  Zurich emphasizes that Niergarth investigated the claim after Martin made his May 14, 2018 $275,707.04 settlement demand, disputed the valuation in a November 15, 2018 phone call with Martin based on discrepancies with Robinette's workers' compensation claim, and requested medical records, including the MRI films that were never produced.  Id. at 11-12.  Zurich also points to the May 6, 2019 email in which Martin made a settlement demand for the policy limits, i.e., $1,000,000, despite only having $50,329.65 and lost wages of $128,000.00 to that date.  Id. at 13.  Zurich also asserts that its conduct after the July 10, 2019 submission of the Bowman life care plan, Barrett report, and demand letter was

31

reasonable inasmuch as it invited Robinette to mediation with Bangham, at which it made a $150,000 offer and after which it made a $175,000 offer (representing a total valuation of $285,000 when Cabell's $100,000 payout and $10,000 PIP payments are taken into account).[10]  Id. at 14-15.

Zurich also contends that Robinette has not produced an expert witness to value the underinsured motorist claim, which in turn makes him "unable to establish that Zurich's actions in this regard amount to intentional misconduct or reckless disregard of Plaintiff's rights."  ECF No. 68, at 15.

Robinette contends that Zurich acted with reckless disregard for whether coverage existed inasmuch as the truck

---

[10]    Zurich also posits that the evaluations of three experts, Mukkamala, Andrew Rentschler, PhD., and Dr. James Vascik, demonstrate that Robinette's valuation of the underinsured motorist claim is debatable.  ECF No. 68, at 15-17.  Zurich explains that it has not provided these experts' reports out of "privacy concerns" inasmuch as they contain the plaintiff's medical information.  Id. at 15 n. 8, 15 n. 9, 16 n. 10.

Needless to say, "parties must support their factual assertions by citing to particular materials in the record, including documents, affidavits, and declarations" when briefing a summary judgment motion.  Corr v. Bureau of Pub. Debt, 987 F. Supp. 2d 711, 716 (S.D. W. Va. 2013) (citing Fed. R. Civ. P. 56(c)(1)(A)).  And if an exhibit contains particularly sensitive information, a party may either redact the sensitive information from the exhibit or move for leave to seal the exhibit.  See L.R. Civ. P. 26.4(c).  Since the defendant has not availed itself of either of these options, the unsupported assertions are given no weight in this analysis.

driven by Robinette was owned by Falcon Ridge, a named insured
on the policy, the claim file reveals no effort to investigate
whether coverage existed from November 28, 2017 to May 4, 2018,
by virtue of which the insurance company did not correct its
mistaken denial of coverage for five months and a week.  ECF No.
72, at 8-9.  The plaintiff points to the testimony of Zurich's
Hurlbert, which he claims indicates that a coverage
determination should have been made within 30 days of the
submission of the claim and that any investigation into the
existence of coverage should have been logged in the claim file.
Id. at 9-10.  Robinette disputes Zurich's explanation of the
coverage determination mistake inasmuch as Falcon Ridge, the
owner of the truck, was itself a named insured on the policy and
the defendant had in its possession the Preliminary Incident
Investigation Report conducted by Eagle Creek and Hawkeye, which
demonstrates that the companies were affiliated.  Id. at 10.
Robinette also argues that the "medical and economic reports
submitted by Plaintiff's experts," presumably Barrett and
Bowman, demonstrate that the Cabell's insurance coverage was
insufficient to compensate the plaintiff's injuries and that
these reports made it clear that Zurich was obligated to pay the
underinsured motorist claim.  Id. at 8.

The court makes several observations that guide its analysis.  First, the motion for summary judgment only requests summary judgment on Robinette's bad faith claim.  <u>See</u> <u>generally</u> ECF No. 67; ECF No. 68.  It does not seek summary judgment on the claim characterized as a "personal injury" claim, which appears to effectively be a claim for payment due under the underinsured motorist policy.

Second, although they have not conducted a choice of law analysis, the parties cite to Kentucky law in support of their respective positions on the bad faith claim.  <u>See</u> ECF No. 68; ECF No. 72; ECF No. 74.  Inasmuch as the parties appear to agree that Kentucky law applies to the bad faith claim, a choice of law analysis is unnecessary, and the court will apply Kentucky law.  <u>See</u> <u>Vanderhoof-Forschner v. McSwegan</u>, 215 F.3d 1323, 2000 WL 627644, at *2 (4th Cir. May 16, 2000) ("[B]ecause the parties agree that Maryland law governs their claims, we need not inquire further into the choice-of-law questions.") (citing <u>American Fuel Corp. v. Utah Energy Dev. Co.</u>, 122 F.3d 130, 134 (2d Cir. 1997)).

Third, the complaint makes no reference to statutory bad faith, <u>i.e.</u> a bad faith claim brought pursuant to the Kentucky Unfair Claims Settlement Practice Act, or for that

matter, any statutes at all.  <u>See</u> ECF No. 1-1.  The Magistrate Judge made this observation and limited discovery accordingly.

At any rate, "[a] single test under Kentucky law exists for the merits of bad-faith claims, whether brought by a first - or third — party plaintiff or brought under common law or statute."  <u>Rawe v. Liberty Mut. Fire Ins. Co.</u>, 462 F.3d 521, 527 (6th Cir. 2006); <u>see</u> <u>also</u> <u>Davidson v. Am. Freightways, Inc.</u>, 25 S.W.3d 94, 100 (Ky. 2000) (noting that the Supreme Court of Kentucky has "gathered all of the bad faith liability theories under one roof and established a test applicable to all bad faith actions . . . .")  That test is set forth in <u>Wittmer v. Jones</u>, 864 S.W.2d 885, 890 (Ky. 1993), which the parties agree governs, and prescribes the following criteria applicable to all Kentucky law bad faith claims:

> [A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed . . . .  [A]n insurer is . . . entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts.

(alterations in original) (quoting <u>Federal Kemper Ins. Co. v. Hornback, Ky.</u>, 711 S.W.2d 844, 846-47 (Ky. 1986) (Leibson, J., dissent)); <u>accord</u> ECF No. 68, at 8; ECF No. 72, at 7-8.

The Wittmer test requires evidence of outrageous conduct or "reckless indifference to the rights of others." Holloway v. Direct Gen. Ins. Co. of Mississippi, Inc., 497 S.W.3d 733, 738 (Ky. 2016) (citing Motorists Mut. Ins. Co. v. Glass, 996 S.W.2d 437, 452 (Ky. 1997)).  Put differently, "[t]he tort of bad faith is non-existent under [Kentucky] law, unless the underlying conduct is sufficient to warrant punitive damages."  Id.  "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." Farmland Mut. Ins. Co. v. Johnson, 36 S.W.3d 368, 376 (Ky. 2000) (citation omitted); accord Phelps v. State Farm Mut. Ins. Co., 736 F.3d 697, 704 (6th Cir. 2012); Foster v. Am. Fire and Cas. Co., 219 F. Supp. 3d 590, 595 (E.D. Ky. 2016).  Although Wittmer speaks in terms of claim denials, actual denial of an insurance claim is not a prerequisite for a bad faith action, and "[b]ad faith litigation often occurs even after an insurance company ultimately settles a disputed claim" as the Farmland standard suggests.  Foster, 219 F. Supp. 3d at 595 (collecting cases).

Two periods of time are relevant to the bad faith claim asserted by Robinette: the period preceding May 4, 2018, during which Zurich maintained that underinsured motorist coverage did not exist, and the period from May 4, 2018 onward, during which Zurich acknowledged underinsured motorist coverage existed but did not settle with the plaintiff.

### A.  Bad Faith Prior to May 4, 2018

In dispute is whether Zurich's November 28, 2017 misrepresentation concerning the availability of underinsured motorist coverage under the policy and its failure to correct the mistake prior to May 4, 2018 constituted bad faith.  On this point, the parties offer various arguments but do not point to any Kentucky case in which an insurer misinforms a claimant that no coverage exists only to revise its position some months later.

The defendant does, however, correctly state that an underinsured motorist coverage insurer is ordinarily not obligated to pay a claim until the related liability claim is exhausted.  The Supreme Court of Kentucky has generally found that "[t]he tortfeasor's liability insurance is the primary coverage, and the UIM insurance is the secondary or excess coverage."  Cincinnati Ins. Co. v. Samples, 192 S.W.3d 311, 315 (Ky. 2006) (citing Kentucky Farm Bureau Mut. Ins. Co. v.

Rodgers, 179 S.W.3d 815, 818 (Ky. 2005)).  "[A]n insured must prove the extent of the tortfeasor's liability in order to claim UIM benefits," and relatedly, "the policy limits in the tortfeasor's policy [must be] exhausted before the UIM carrier [is obligated] to pay." Riggs, 484 S.W.3d at 729 (third alteration in original) (internal quotation marks omitted) (quoting Coots v. Allstate Ins. Co., 853 S.W.2d 895, 899 (Ky. 1993)).  Exhaustion of the tortfeasor's policy limits may be accomplished by obtaining a judgment or by settlement, provided that "the UIM insured notifies his UIM carrier of his intent to [settle] and provides the carrier an opportunity to protect its subrogation . . . ." Coots, 853 S.W.3d at 900.

Kentucky courts have also found a lack of exhaustion of primary insurance policy limits to weigh against or preclude recovery in bad faith against excess insurers.  See Motorists Mut. Ins. Co., 996 S.W.2d at 453; Caudill v. New Hampshire Ins. Co., No. 2014-CA-000921-MR, 2016 WL 3356439, at *5-6 (Ky. Ct. App. June 10, 2016) (unpublished); Justice v. Allstate Ins. Co., No. 2003-CA-000679-MR, 2004 WL 178709, at *3 (Ky. Ct. App. Jan. 30, 2004) (unpublished).  But in doing so, they have generally considered the actual provisions of the excess insurance policies underlying the respective bad faith claims.  Motorists Mut. Ins. Co., 996 S.W.2d at 441-42; Caudill, 2016 WL 3356439,

at \*5-6; but see Justice, 2004 WL 178709, at \*2-3 (affirming the
trial court's entry of judgment on the pleadings without
consulting the terms of the excess insurer's policy).  This
seems necessary inasmuch as a policy limits exhaustion argument
ostensibly pertains to the first element of the Wittmer test,
i.e., that "the insurer must be obligated to pay the claim under
the terms of the policy."  864 S.W.2d at 890 (emphasis added).

      In this case, Zurich asserts that it could not be
obligated to pay the underinsured motorist claim until Robinette
settled with Cabell's liability insurer for the policy limits,
which based on the May 3, 2018 release of claims, appears to
have occurred nearly contemporaneously with its acknowledgement
of underinsured motorist coverage on May 4, 2018.  However,
Zurich has not produced the provisions of its policy providing
for underinsured motorist coverage.  In fact, it has produced
only a single page of the policy at issue, the Schedule of Named
Insured(s).  One might assume based on the general nature of
underinsured motorist coverage that the policy did not obligate
it to pay such a claim until Cabell's liability insurance policy
limits were exhausted, but such an assumption is not appropriate
at the summary judgment stage, particularly in light of
Wittmer's requirement that the insurer be obligated to pay the

underlying insurance claim in accordance with the actual terms of the policy.

Further, Robinette raises several cogent points concerning Zurich's November 28, 2017 letter disclaiming underinsured motorist coverage and the five months and one week period in which Zurich failed to correct its misrepresentation. First, the Schedule of Named Insured(s) explicitly listed Falcon Ridge as a named insured, and the crash report named Falcon Ridge as the owner of the truck Robinette was driving when the October 2, 2017 accident occurred. And while J. Rudy Martin opined that Zurich investigated whether Hawkeye had a contract in place to provide services for Eagle Creek and that it had declined to insure Hawkeye, he acknowledged that Falcon Ridge itself was a named insured.

Relatedly, Markel's November 28, 2017 letter to Martin plainly indicated that underinsured motorist coverage did not exist under the policy. It did not state that Robinette, as an employee of Hawkeye rather than that of a named insured, was ineligible to submit a claim under the underinsured motorist policy. Christensen testified that he did not discover any claim file entries in which Zurich suggested that Robinette could not submit a claim as an employee of Hawkeye rather than a named insured.

In addition, Hurlbert testified that action taken concerning the investigation of a claim should be logged in the claim file.  It is undeniable that such action was taken between November 28, 2017, and May 4, 2018 – otherwise Markel would not have acknowledged coverage after claiming that it did not exist in the November 28, 2017 letter.  But the record fails to establish how or when Zurich determined that coverage existed, and Zurich does not offer an explanation.

### B.  Bad Faith Since May 4, 2018

Turning to Zurich's conduct after the May 4, 2018 acknowledgement of coverage, the court notes that Martin made his first settlement demand on May 14, 2018, ten days after learning of the $1 million insurance coverage, for $275,707.04 (based on a total damages estimation of $3,316,630.04-$3,349,630.04), an amount well within the underinsured policy limits of $1,000,000.  On June 19, 2018, Niergarth requested and received a 30-day extension to review the claim and respond to the demand letter, and ostensibly conducted some investigation in July of 2018.  However, the record reveals no further investigation or discussion with Martin until November 15, 2018, on which date Niergarth effectively rejected the settlement demand, requested further medical records (which were apparently not produced), and

indicated that Zurich would seek an independent radiological review of Robinette's records.  Martin made another settlement demand, this time for the policy limits, on May 6, 2019, and it does not appear that Zurich responded to this demand.  The July 10, 2019 settlement demand for the policy limits included the Bowman life care plan and Barrett report on damages as attachments.

On July 29, 2019, Sanders invited Martin and Robinette to the August 26, 2019 mediation for the related Bangham case. Zurich offered $150,000, which was rejected inasmuch as Martin demanded $500,000.  Sanders' August 27, 2019 letter extended another offer for $175,000.  The letter also indicated that any payout for Bangham's underinsured motorist claim, set for trial in October 2019, would be drawn against the $1,000,000 policy limits set for both Robinette and Bangham under the policy, a point recognized by Martin as well.  In addition, Sanders noted that Zurich had not yet received all of Robinette's medical records or conducted an independent medical examination of the plaintiff.  The only evidence of an independent medical examination is that conducted by Mukkamala, whose findings have not been produced, some time after he was retained on March 19, 2020, at which time discovery was ongoing in this action.

Delay alone is generally insufficient to establish bad faith.  See Motorists Mut. Ins. Co., 996 S.W.2d at 452-53. However, the Sixth Circuit, applying Kentucky law, observed in Phelps that:

> [a]lthough the early months of the claims process —
> from September 2003 through February 2004 — may be
> attributed to the time needed for a reasonable
> investigation, a legitimate question arises as to
> whether the delay involved in obtaining records from
> Phelps's 1999 injury recklessly disregarded Phelps's
> rights.  State Farm first noted this earlier injury in
> its February 11, 2004 log notes, but there is no
> evidence that records were requested from Phelps until
> September of that year. There is no explanation in the
> record for this six-and-a-half month delay beyond the
> fact that the claims adjuster was replaced for the
> second time in the interim . . . .

736 F.3d at 706.  In this case, there is no explanation given for Niergarth's delay in responding to the May 14, 2018 settlement demand beyond July 2018.  On June 19, 2018, she requested 30 days to further investigate and respond to that demand, and proceeded to conduct some investigation the following month, after which there is a lapse in evidence of further activity on Zurich's part.  She did not discuss the demand with Martin until November 15, 2018 - long after the 30 additional days had elapsed.  This could lead to an inference of a delay tactic consistent with reckless disregard for Robinette's rights.  See id.

Moreover, "repeated requests for records and an insurer's apparent heightened degree of scrutiny surrounding a particular claim could give rise to an inference that the insurer sought to be thorough and fair," but they may also support "an inference that the insurer was specifically searching for a justification to deny coverage." Foster, 219 F. Supp. 3d at 598 (internal quotation marks omitted) (citing Estate of Riddle v. Southern Farm Bureau Life Ins. Co., 421 F.3d 400, 408 (6th Cir. 2005)). Ultimately, such issues are for a jury to decide. Id.

Niergarth requested additional medical records on November 15, 2018, and Sanders noted that some medical records had yet to be provided in his August 27, 2019 letter. Yet, Sanders made $150,000 and $175,000 settlement offers without such medical records at a time when he had already received evidence that Robinette would claim that his damages exceed the underinsured motorist coverage's $1,000,000 policy limits inasmuch as Martin had transmitted the Bowman life care plan and Barrett report to Zurich on July 10, 2019 when he made a demand for the $1,000,000 policy limits.

In addition, Sanders made such settlement offers without a prior independent medical examination of the plaintiff, even though he insinuated that one should occur. And

44

the record does not indicate that such an examination was actually conducted until after Mukkamala was retained during this litigation on March 19, 2020.

Whether Martin or Zurich's claim professionals were at fault for any delay relating to missing medical records or independent medical examinations is outside the scope of this opinion. The record, as it stands now, however, could support inferences in favor of either party.

Further, other "troubling claims-handling practices," such as "switching claims adjustors four times without explanation," can weigh against summary judgment on a Kentucky law bad faith claim. Phelps, 736 F.3d at 707. As was the case in Phelps, four different claim professionals, namely, Markel, Niergarth, Norton, and Sanders, handled Robinette's claim between November 27, 2017 and August 28, 2019, with little to no explanation for the claim's transfer. And at least one of the transfers resulted in a substantive delay inasmuch as Niergarth requested and received a 30-day extension to investigate the claim and respond to the first demand letter on June 19, 2018, after she was assigned to the claim. As above indicated, it does not appear that she actually responded to the first settlement demand until November 15, 2018, well after the 30-day period had elapsed.

Zurich has a right to challenge claims that are "fairly debatable" under the relevant facts or law. <u>Farmland</u> <u>Farmland Mut. Ins. Co.</u>, 36 S.W.3d at 368; <u>see also</u> <u>Wittmer</u>, 864 S.W.2d at 890. But a "disputed factual matter — such as a disagreement over the appropriate valuation of the loss — will not always preclude a bad-faith claim as a matter of law . . . ." <u>Philadelphia Indem. Ins. Co. v. Youth Alive, Inc.</u>, 732 F.3d 645, 650 (6th Cir. 2013) (citing <u>Farmland Mut. Ins. Co.</u>, 36 S.W.3d at 375).

In this case, the dispute apparently concerned the valuation of the underinsured motorist claim as it pertains to Robinette's medical and related expenses, lost wages, and pre-existing conditions. The Barrett report provided Zurich with evidence of future lost wages in excess of its policy limits as well as medical expenses relating to the accident in excess of the policy limits as set forth by Bowman's life care plan. J. Rudy Martin's report provides some evidence concerning Zurich's investigation of preexisting conditions, such as multilevel degenerative disc disease and bilateral sacroiliac degenerative joint disease, but it does not rebut the Bowman and Barrett reports or suggest a proper valuation of the damages caused by the accident. And more generally, there is not sufficient evidence in the record documenting preexisting

conditions such that the court could find Robinette's policy limits demand "fairly debatable" as a matter of law. At best, there appears to be genuine disputes of material fact on these issues.

### C.   Summary

Based on the foregoing, the court concludes that Zurich is not entitled to summary judgment on the bad faith claim inasmuch as a jury could reasonably find that its conduct constituted, at least, reckless disregard for the plaintiff's rights.

### D.   Expert Testimony for Valuation of the Bad Faith Claim

Finally, Zurich contends that Robinette lacks expert testimony to value the underinsured motorist claim such that he may establish bad faith in failing to settle the claim. This argument is premised on the fact that Christensen did not offer opinions on damages and claim valuation after Zurich determined that coverage was available on May 4, 2018. ECF No. 68, at 12. The insurer cites a dissent from <u>Farmland Mut. Ins. Co.</u> for the proposition that "[j]urors would have little reason to know what is evidence of bad faith in the adjustment of insurance claims" without expert testimony. <u>Id.</u> at 11 (citing <u>Farmland</u>, 36 S.W.3d at 389 (Graves, J. dissent)).

47

It is true that Christensen did not opine about the extent of Robinette's injuries or the valuation of the underinsured motorist claim.  However, Robinette states in the parties' proposed integrated pretrial order (ECF No. 129) that he expects to call Bowman at trial for "knowledge regarding the extent of Plaintiff's injuries, the cost of future care, and causation," as well as Barrett for "knowledge and opinions regarding Plaintiff's economic damages."  Id. at 2.  And these experts' opinions ostensibly pertain to the valuation of the underinsured motorist claim inasmuch as Martin used them to inform his July 10, 2019 settlement demand for the policy limits.

The court notes that Bowman has produced two expert reports, one dated May 23, 2019, and another dated June 30, 2020.  ECF No. 75-1 (May 23, 2019 Report); ECF No. 75-2 (June 30, 2020 Report).  By a separate motion in limine filed September 2, 2020, Zurich has moved to strike or exclude the second report, arguing that it is not a Federal Rule of Civil Procedure 26(a) supplement of the original report and that it is untimely.  ECF No. 75 (Motion to Strike, or in the Alternative, Exclude the Second Bowman Report).

Still, Zurich does not seek to strike or exclude the first report, titled "Physical Medicine and Rehabilitation Disability Evaluation," which was prepared in connection with the life care plan.  ECF No. 75-1.  Further, Robinette's expert witness disclosure statement submitted to Zurich with the initial report states that "Dr. Bowman is expected to testify regarding the Plaintiff[']s medical history and the injuries sustained in this accident.  Dr. Bowman will testify that any injuries sustained in the accident are serious and have not resolved."  <u>Id.</u> at 2.  Thus, even if Bowman's second report is not deemed admissible, he will be able to testify to issues pertaining to the valuation of the underinsured motorist claim consistent with the first report insofar as that valuation depended on medical information reviewed by the expert.  Whether Bowman's second report should be excluded, however, is yet to be determined.

The court accordingly declines to enter summary judgment on the grounds that Robinette has failed to produce an expert to testify regarding the valuation of the underinsured motorist claim.

IV.   Conclusion

Based on the foregoing, it is ORDERED that Zurich's renewed motion for summary judgment (ECF No. 111) be, and it hereby is, DENIED.

The Clerk is directed to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER:   April 15, 2021

John T. Copenhaver, Jr.
Senior United States District Judge

50